68 F.3d 577
 In re the SEIZURE OF ALL FUNDS IN ACCOUNTS IN the NAMES
REGISTRY PUBLISHING, INC., Sterling Who's Who, Inc., Who's
Who of Retailers, Inc., William's Who's Who, Inc., Who's Who
Executive Club, Bruce Gordon, Who's Who Worldwide Registry,
Inc., Publishing Ventures, Inc., including but not limited
to Marine Midland Bank Account Nos. 018-78090-3,
018-78047-4, 018-78044-0, 018-78055-5, 018-78153-5,
018-78173-0, Sterling National Bank & Trust Company of New
York Account Nos. 035-79716-07, 031-43410-01, 031-43402-01,
Republic National Bank for Savings Account No. 2601001775,
and All Funds Traceable Thereto.
Bruce GORDON, Who's Who Worldwide Registry, Inc., Sterling
Who's Who, Inc., Registry Publishing, Inc., William's Who's
Who, Inc., Who's Who Executive Club, Publishing Ventures,
Inc., Who's Who of Retailers, Inc., Petitioners-Appellees,
v.
UNITED STATES of America, Respondent-Appellant.
 No. 474, Docket 95-6119.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 31, 1995.
Decided Oct. 17, 1995.
 
 1
 Barbara Underwood, Assistant United States Attorney, Brooklyn, NY (Zachary W. Carter, United States Attorney for the Eastern District of New York, Deborah B. Zwany, Arthur P. Hui, Sarah J. Lum, Gary R. Brown, Assistant United States Attorneys, Brooklyn, NY, of counsel) for Respondent-Appellant.
 
 
 2
 Vivian Shevitz, Mount Kisco, New York (Gerald L. Shargel, Jane Simkin Smith, Carol E. Gette, New York City, of counsel) for Petitioners-Appellees.
 
 
 3
 Before MINER and CALABRESI, Circuit Judges, and POLLACK, Senior District Judge.*
 
 MILTON POLLACK, Senior District Judge:
 
 4
 The government appeals from an order entered in the United States District Court for the Eastern District of New York (Spatt, J.) vacating an ex parte seizure warrant that authorized the seizure of funds belonging to petitioners-appellees Bruce Gordon and several companies under Gordon's control, and releasing funds seized pursuant to the warrant. The district court determined that the government failed to establish probable cause to believe that petitioners had committed mail or wire fraud in violation of 18 U.S.C. Secs. 1341 and 1343.
 
 
 5
 For the reasons that follow, we vacate the order and remand for further findings and reconsideration in light of new evidence.
 
 BACKGROUND
 
 6
 Petitioner Bruce Gordon founded and owns a controlling interest in the companies involved in this case, including: Who's Who Worldwide Registry, Inc., Sterling Who's Who, Inc., Who's Who Executive Club, Who's Who Worldwide Communications, Tribute Magazine, Registry Publishing, Inc., Publishing Ventures, Inc., Who's Who of Retailers, and William's Who's Who (collectively, the "Companies"). The oldest of the Companies, Who's Who Worldwide Registry, Inc., was incorporated in 1989.[1]
 
 
 7
 Gordon formed the Companies in order to solicit individuals to purchase memberships in the registries published by the Companies. The Companies' salespersons contacted potential customers either by telephone or by sending solicitation letters through the mail. The salespersons explained to potential customers that, upon becoming a member, they would receive a registry containing biographical data and addresses of all members, a personalized plaque, and a camera-ready logo. In addition, customers were told that, as members, they could purchase a CD-ROM version of the registry, a subscription to Tribute, a magazine containing profiles of other members, a credit card, and discounted telephone and travel services. The salespersons also stressed that membership was exclusive and prestigious, and that membership would provide valuable networking opportunities. As a result of their sales efforts, the Companies had acquired more than 60,000 members by the end of 1994.
 
 
 8
 In July of 1994, based on complaints regarding the Companies' business practices received from the New York State Department of Law, the New York State Consumer Protection Board and the Better Business Bureau, the United States Postal Inspection Service commenced an investigation into Gordon and the Companies. The investigation culminated in a complaint and affidavit (the "Complaint"), sworn to by Postal Inspector Martin T. Biegelman. In the Complaint, Biegelman alleges that the Companies' business operations constitute a "telemarketing boiler room" operation using "high pressure telephone sales pitches that misrepresent the identity of the Company and the nature of its products in order to defraud customers into purchasing one of the Company's 'Who's Who' directories and other products." Biegelman contends that the Companies' salespersons made fraudulent representations regarding the nomination and selection process for membership in the registries, the prestige of the registries, free placement in the registries, the identity of other members of the registries, the usefulness of the registries as a networking tool, and the intention of the Companies to hold seminars and conferences. Since 1989, according to Biegelman, Gordon and the Companies have defrauded their customers of more than $22 million dollars. The Complaint concludes with the allegation that the Companies' use of the mail and telephones to conduct the solicitations was in furtherance of a scheme to defraud, and therefore constitutes a violation of the mail and wire fraud statutes.
 
 
 9
 On March 22, 1995, based on the allegations in the Complaint, United States Magistrate Judge Azrack signed arrest warrants for Gordon and twenty-nine of the Companies' salespersons. The following day, the government obtained an ex parte warrant of seizure, pursuant to Fed.R.Crim.P. 41, authorizing the seizure of funds deposited in certain of the Companies' bank accounts. Thereafter, on March 30, 1995, the government seized over $511,000 of the Companies' funds, allegedly the proceeds of the scheme to defraud. As part of its investigation, the government also began contacting and sending questionnaires to those who purchased registry memberships.
 
 
 10
 On April 10, 1995, the district court issued a temporary restraining order ("TRO") enjoining the government from sending additional questionnaires to members of the Companies' registries. On April 19 and 20, the district court held a probable cause hearing pursuant to United States v. All Assets of Statewide Auto Parts, Inc., 971 F.2d 896, 905 (2d Cir.1992) and United States v. Monsanto, 924 F.2d 1186, 1203 (2d Cir.1991).
 
 
 11
 On May 30, 1995, the district court vacated the seizure warrant, finding that the government had failed to establish that there was probable cause to believe that the Companies had committed mail or wire fraud. Relying primarily on United States v. Regent Office Supply Co., 421 F.2d 1174 (2d Cir.1970), the court determined that the representations made by the Companies' salespersons were not part of a scheme to defraud. The court found that some of the representations were not false, such as the Companies' statements that their registries were "selective" and "invaluable tools for networking among members." Other representations were found by the court to be false or misleading but not material, such as the Companies' statements that they did not acquire new members by solicitation for their directories and that "the majority of new candidates who are nominated are not accepted for inclusion." The district court concluded that the Companies' representations did "not constitute a scheme or artifice to defraud, either singly or in the aggregate." In addition to vacating the seizure warrant, the district court vacated the TRO against the government.
 
 
 12
 The government then moved for a stay of the release of the seized funds. On June 7, 1995, the district court granted a temporary stay pending application to this court for a further stay. On the same day, the government filed a Notice of Appeal of the district court's May 30 Order. On June 9, the court released $220,000 of the seized funds. On June 26, 1995, we denied the government's motion for a stay, pending appeal to this court, of the partial release of seized funds granted by the district court. In re All Funds in Accounts in Names Registry Publishing, Inc., 58 F.3d 855 (2d Cir.1995).
 
 
 13
 Since the district court's May 30, 1995 vacatur of the TRO, the government has redesigned its questionnaire in order to generate from the registry members information regarding the materiality of the misrepresentations. The government now has mailed over 49,000 questionnaires to the members, and has received approximately 7000 responses. The government has moved in this court for permission to supplement the record with the responses to these questionnaires or, in the alternative, for remand to allow the district court to consider whether its order should be modified in light of these questionnaires.
 
 DISCUSSION
 1. Probable Cause
 
 14
 In order to seize property under 18 U.S.C. Sec. 981, the government must demonstrate that there was probable cause to believe that the property is subject to forfeiture. Marine Midland Bank, N.A. v. United States, 11 F.3d 1119, 1124 (2d Cir.1993). In the context of the seizure of bank accounts allegedly forfeitable under Sec. 981,
 
 
 15
 [p]robable cause is established if the government can show that it has reasonable grounds, more than mere suspicion, to believe that the property is subject to forfeiture. The government must be able to show a nexus between the illegal conduct and the seized property. The government is not required to link a bank account to a particular illegal transaction, but it must have probable cause to connect the account to criminal activity.
 
 
 16
 Id. at 1126 (citations omitted).
 
 
 17
 Whether probable cause exists must be determined on the basis of the totality of the circumstances. United States v. Ceballos, 812 F.2d 42, 50 (2d Cir.1987). In the context of civil forfeiture proceedings, these circumstances are not limited to evidence presented to the magistrate who issued the warrant. United States v. 4492 South Livonia Rd., 889 F.2d 1258, 1268 (2d Cir.1989) ("Once a forfeiture proceeding is brought, if further evidence is legally obtained to justify [a finding of probable cause], there is no persuasive reason to bar its use."). The findings supporting a district court's determination as to probable cause are reviewed for clear error, but the determination itself is a conclusion of law reviewed de novo. United States v. Holder, 990 F.2d 1327, 1328 (D.C.Cir.1993).
 
 
 18
 The mail fraud statute, 18 U.S.C. Sec. 1341, provides, in relevant part, that a person is guilty of mail fraud if,
 
 
 19
 having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do, [the person] places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service.
 
 
 20
 An essential element of mail fraud, and the element that is in dispute here, is intent to defraud. See United States v. D'Amato, 39 F.3d 1249, 1256-57 (2d Cir.1994). In order to establish that the defendant acted with an intent to defraud, the government "must show that some actual harm or injury was contemplated by the schemer." Id. at 1257 (internal quotations omitted).
 
 
 21
 In United States v. Regent Office Supply Co., 421 F.2d 1174 (2d Cir.1970), we stated that an intent to defraud could be found in sales tactics that misrepresent the usefulness of an item. Id. at 1180. We asserted that:
 
 
 22
 cases sustaining convictions for mail fraud have involved sales tactics and representations which have tended to mislead the purchaser, or prospective purchaser, as to the quality or effectiveness of the thing being sold, or to mislead him with regard to the advantages of the bargain which should accrue to him. Thus claims or statements in advertising may go beyond mere puffing and enter the realm of fraud where the product must inherently fail to do what is claimed for it. And promotion of an inherently useful item may also be fraud when the scheme of promotion is based on claims of additional benefits to accrue to the customer, if the benefits as represented are not realistically attainable by the customer.
 
 
 23
 Id. (internal quotations omitted). Accordingly, in order for sales tactics to rise to the level of mail fraud, misrepresentations must be material to the bargain that the customer is induced to enter into with the company. See id. at 1182.
 
 
 24
 In Regent, we held that the particular misrepresentations made by the salespersons were not material to the nature of the bargain between the companies and the customers. Id. In that case, customers bargained for office stationery, and, although misrepresentations were made by the stationery companies in order to gain the attention of the customers, the customers received the products for which they had bargained. Id. at 1180. Accordingly, such false claims were not material to the bargain between the customers and the companies.
 
 
 25
 We affirmed the conviction for mail fraud in United States v. Rowe, 56 F.2d 747 (2d Cir.), cert. denied, 286 U.S. 554, 52 S.Ct. 579, 76 L.Ed. 1289 (1932), involving a scheme to sell worthless land. Although the victims of the scheme did not prove that they had suffered any loss, this court held that the defendants had committed mail fraud because
 
 
 26
 [a] man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value. It may be impossible to measure his loss by the gross scales available to a court, but he has suffered a wrong; he has lost his chance to bargain with the facts before him.
 
 
 27
 Id. at 749. In Regent, we noted that the "formulation of law stated in the Rowe decision" affirmed the proposition "that a wrong has been suffered when a man is deprived of his chance to bargain 'with the facts before him' where the absent facts are facts material to the bargain he is induced thereby to enter." 421 F.2d at 1182 (emphasis added).
 
 
 28
 In the present case, the government contends that the Companies' misrepresentations likewise were material to the bargain between the members and the Companies. The government argues that networking and the financial opportunities that networking might generate were the principal purposes for which the members had joined the Companies' registries. According to the government, the value of the networking, and hence the value of the membership, largely was dependent on the selection criteria and processes used to choose the members. Since the Companies misrepresented these criteria and processes, the government argues, the false claims were material to the nature of the bargain between the members and the Companies, and therefore constituted mail fraud.
 
 
 29
 The district court, however, found that the misrepresentations of the Companies did not rise to the level of mail fraud. The court stated that the bargain between the Companies and the members entailed both 1) the purchase of "membership in a registry that the member will be listed in," and 2) the Companies' making available "other services or products that either accompany the purchase free of charge" or are available to the members for a cost. In evaluating whether the Companies' sales tactics were material to this bargain, the court examined separately each of the nineteen misrepresentations allegedly made by the Companies. The court concluded that the misrepresentations did "not constitute a scheme or artifice to defraud, either singly or in the aggregate."In making this determination, the district court largely relied on our description of fraudulent sales tactics in Regent, and found that the sales tactics used by the Companies did not amount to mail fraud. Although the court determined that some of the Companies' representations were "false or deceiving," it found that these representations were "not material to the bargain struck between the membership purchaser and the Company." The court stated that the representations were "not directed at 'the quality, adequacy or price of the goods,' nor [did] they concern facts 'essential in deciding whether to enter the bargain.' " Furthermore, the court found that the members "received exactly what [they] paid for when they purchased a membership," and that there was not a "discrepancy between benefits reasonably anticipated because of the misleading statements and the actual benefits which the defendant delivered, or intended to deliver." Accordingly, the court determined that the government had not shown that it had probable cause to believe that the Companies had committed mail or wire fraud.
 
 
 30
 Although the court concluded that the Companies' misrepresentations were not material to the bargain between the Companies and the members, we think that the court did not fully evaluate the true nature of the bargain. The members had bargained with the Companies to join exclusive registries that would provide opportunities for networking among a prominent group of individuals. Although the members did obtain membership in "selective" registries, they had bargained to join registries of a more exclusive nature than ones whose members merely were culled from mailing lists. As a result, this may be a different situation than that presented in Regent, where the consumers received the products for which they had bargained. In the present case, membership in the registries may not have provided the members with the full networking capability that they expected to receive from the Companies. On remand, the district court should re-examine, with the benefit of the information provided by the new questionnaires, the nature of the bargain and the inducements that impelled the members to join and whether any misrepresentations were material to the bargain.
 
 2. The Injunction
 
 31
 The injunction ordered by the district court enjoined the government from mailing additional questionnaires to obtain further evidence of probable cause. This injunction was improper. In United States v. Burzynski Cancer Research Inst., 819 F.2d 1301 (5th Cir.1987), cert. denied, 484 U.S. 1065, 108 S.Ct. 1026, 98 L.Ed.2d 990 (1988), the Fifth Circuit held that "[a]s an incident to the separation of powers founded in the Constitution, the courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions." 819 F.2d at 1312 (internal quotation omitted); see also LaRouche v. Webster, 566 F.Supp. 415, 417 (S.D.N.Y.1983) (holding that the separation of powers prevents courts from interfering in federal criminal investigations except in the "rarest of circumstances"). We agree. In the present case, the injunction especially resulted in improper interference because, according to our decision in 4492 South Livonia Rd., 889 F.2d at 1258, the government may use post-seizure evidence at a probable cause hearing.
 
 
 32
 On remand, the district court should allow the government to continue collecting questionnaires. We note that, after the vacatur of the injunction, the government redesigned its questionnaires in order to generate from the registry members information regarding the materiality of the misrepresentations. The district court, on remand, should consider the responses to these questionnaires, along with the evidence previously introduced, and reconsider whether the Companies' misrepresentations were material to the bargain between the Companies and the members. The totality of the circumstances should inform the district court's determination of probable cause.
 
 CONCLUSION
 
 33
 For the foregoing reasons, we vacate the order of the district court and remand for further findings and reconsideration in accordance with the foregoing.
 
 
 
 *
 The Honorable Milton Pollack of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 These companies have no affiliation with "Who's Who in America," published by Reed Elsevier, Inc., and first published in 1899