**UNITED STATES of America,**

v.

**Bruce W. GORDON, Who's Who World Wide Registry, Inc., Sterling Who's Who, Inc., Tara Garboski, a/k/a "Tara Green," Oral Frank Osman, a/k/a "Frank Martin," Laura Weitz, a/k/a "Laura Winters," Annette Haley, Scott Michaelson, Steve Rubin, a/k/a "Steve Walden," and Martin Reffsin, Defendants.**

**No. CR96–1016(ADS).**

United States District Court, E.D. New York.

Oct. 18, 1999.

See also 68 F.3d 577, 990 F.Supp. 171.

Loretta Lynch, United States Attorney, Brooklyn, New York, by Ronald G. White, Ceci Scott, Assistant United States Attorneys, for U.S.

Norman Trabulus, Mineola, New York, for Bruce W. Gordon, defendant.

Edward P. Jenks, Mineola, New York, for Who's Who Worldwide Registry, Inc. and Sterling Who's Who, Inc., defendants.

Brian E. Mass, New York City, for Tara Garboski, defendant.

Alan M. Nelson, Lake Success, New York, for Oral Frank Osman, defendant.

John L. Kase, Garden City, New York, for Laura Weitz, defendant.

Martin Geduldig, Hicksville, NY, for Annette Haley, defendant.

Paula S. Frome, Garden City, New York, for Scott Michaelson, defendant.

Thomas F.X. Dunn, New York City, for Steve Rubin, defendant.

John S. Wallenstein, Hempstead, New York, for Martin Reffsin, defendant.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

## I. BACKGROUND

This opinion is rendered with respect to a hearing pursuant to *United States v. Fatico*, 579 F.2d 707, 711 (2d Cir.1978) (*"Fatico"*) held before the Court on June 4, 1999, June 11, 1999, June 30, 1999 and July 2, 1999.

This prosecution and the eventual convictions emanate from a telemarketing scheme devised by Bruce W. Gordon ("Gordon") whereby individuals were solicited to purchase memberships in directories or registries commonly referred to as "Who's Who" publications.

On April 7, 1998, following a jury trial, 297 guilty verdicts were returned on 69 separate counts involving ten different defendants. The jury returned a verdict convicting Gordon of Conspiracy to Commit Mail Fraud (Count 1), Mail Fraud (Counts 1–52), perjury (Count 53), obstruction of justice (Counts 54–55), conspiracy to impair, impede and defeat the IRS (Count 56), evasion of payment of tax (Count 57), filing a false tax return 1992–1994 (Counts 59–61), filing a false collection information statement on September 16, 1991, July 8, 1993, and December 29, 1993 (Counts 66–68), and money laundering (Count 69); Who's Who Worldwide was convicted of conspiracy (Count 1) and mail fraud (Counts 2–38, 40–44, 47, 49, 51, 52); Sterling Who's Who was convicted of conspiracy (Count 1) and mail fraud (Counts 39, 45–46, 48, & 50); Garboski was convicted of conspiracy (Count 1) and mail fraud (Counts 2–38, 40–44, 47, 49, 51, and 52); Weitz was convicted of conspiracy (Count 1) and mail fraud (Counts 2–38, 40–44, 47, 49, 51, and 52); Osman was convicted of conspiracy (Count 1) and mail fraud (Count 2–4, 49, 51, and 52); Haley was convicted of conspiracy (Count 1) and mail fraud (Counts 21–38, 40–44, 47, 49, 51, and 52); Michaelson was convicted of conspiracy (Count 1) and mail fraud (Counts 8–38, 40–44, 47, 49, 51, and 52); Rubin was convicted of conspiracy (Count 1) and mail fraud (44, 47, 49, & 51); and Reffsin was convicted of conspiracy to impair, impede and defeat the IRS (Count 56), evasion of payment of tax (Count 57), assisting in the filing of a false tax return 1992–1994 (Counts 63–65).

On January 8, 1999, the Court denied the motions by the defendants for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure ("Fed.R.Crim. P.") 29(c) ("Rule 29(c)"), or in the alternative, for a new trial pursuant to Fed. R.Crim.P. 33 ("Rule 33").

### A. The Presentence Report

The Presentence Report ("PR"), prepared by United States Probation Officer

Christine B. Roberts on December 21, 1998 states as follows:

29. Gordon is held responsible for the entire loss caused as a result of the fraudulent scheme. The tax returns of Worldwide and Sterling, and other financial records of the Companies indicate that their total sales between 1990 and 1995 were in excess of $20 million. The total sales figure is considered the loss due to the fraud because the product delivered to customers was essentially worthless.

41. Garboski is held responsible for a loss of $16 million, based upon the tax returns and internal corporate books of Worldwide during the course of her employment.

45. Osman is held responsible for a loss of $6.1 million, based upon the tax returns and internal corporate books of Worldwide during the course of his employment.

48. Weitz is held responsible for a loss of $848,000, based upon the tax returns and internal corporate books of Worldwide during the course of her employment.

51. Haley is held responsible for a loss of $862,000, based upon the tax returns and internal corporate books of Worldwide during the course of her employment.

54. Michaelson is held responsible for a loss of $1,129,000, based upon the tax returns and internal corporate books of Worldwide during the course of his employment.

57. Rubin is held responsible for a loss of $246,000, based upon the tax returns and internal corporate books of Worldwide during the course of his employment.

86. Gordon is held responsible for a total tax loss of between $1.5 million and $2,5 million. The government is preparing a precise figure for the loss, but informs that it is at least more than $1.5 million.

87. Reffsin is also held responsible for a total tax loss of between $1.5 million and $2.5 million.

As a result, the sentence report recommends that Gordon receive a 16 level enhancement as a result of the amount of loss, pursuant to Guideline 2F1.1(b)(1)(Q). With regard to the other defendants, the Probation Department has recommended the following enhancements based upon the amount of loss and pursuant to Guideline 2F1.1(b)(1): Garboski (15 levels), Osman (14 levels), Weitz (11 levels), Haley (11 levels), Michaelson (11 levels) and Rubin (8 levels). With regard to the tax convictions of Gordon and Reffsin, pursuant to Guideline 2T4.1(O), the sentence report recommends that they receive a base offense level of 20.

The only two issues presently before the Court are: (1) To what extent, if any, the loss enhancement provisions of Guideline 2F1.1 should apply to the respective defendants. In other words, what is a reasonable estimate of the fraud loss in this case? and (2) What is the reasonable estimate of the tax loss?

## II. *THE FATICO HEARING*

### A. *The Burden of Proof*

The burden of proof at the *Fatico* hearing is on the Government to establish the facts required to support the amount of the fraud and tax losses, by a preponderance of the evidence. *U.S. v. Shonubi*, 998 F.2d 84 (2d Cir.1993); *U.S. v. Carmona*, 873 F.2d 569 (2d Cir.1989); *U.S. v. Lee*, 818 F.2d 1052, 1057 (2d Cir.), *cert. denied*, 484 U.S. 956, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987).

### B. *The Fatico Hearing*

After a review of all the evidence taken at the *Fatico* hearing, and considering the relevant trial testimony, the Court makes the following findings.

### 1. With Regard to the Fraud Loss

The Government did not present any new evidence at the *Fatico* hearing. Instead, the Government relied upon the testimony of the 23 witnesses who testified at the trial that had they known that they were selected at random from a mailing list and not "nominated" by a peer in their profession, they would have undoubtedly declined to become members and would not have paid the membership fees. In order to demonstrate that the 23 witnesses who testified at the trial were an accurate sample of the approximate 75,000 members of Who's Who, and the members who answered some of the approximate 50,000 questionnaires that had been mailed by the Agents, the Government introduced the deposition of Postal Inspector Alphonse Pagano, who described the process by which the 23 trial witnesses were selected. Of the 50,000 questionnaires, the Government received approximately 7,000 responses.

The first witness called by the defendants was Jerald Tenenbaum, a lawyer, who was hired by the defendants to assist in the review of the questionnaires sent by the Government to potential victims of Who's Who and to conduct searches on both NEXIS and the internet to ascertain the usage of the Who's Who membership. Tenenbaum testified that he found approximately 70 articles or press releases where Who's Who was mentioned as an accolade, an award or in honor of the member. In addition, Tenenbaum stated that from an internet search, he located approximately 200 references to the Who's Who membership on individual resumes.

■ Christopher Rosetti, a forensic accountant, also testified on behalf of the defendants at the *Fatico* hearing. Rosetti attempted to quantify the value of a membership in Who's Who. He testified that some of the services offered through membership at Who's Who included a no-annual fee credit card, a discount with Airborne Express, a discount long-distance telephone program, the business advantage program, auto insurance and a CD–ROM that included a list of other members. In addition, Rosetti testified that the cumulative value of the business opportunities that were realized by members of Who's Who was approximately $21 to $51 million. Rosetti also indicated that, although he did not compute the exact value, many members could have taken a tax deduction for the cost of membership. However, as to this latter contention, the Court finds this deduction from the fraud loss to be improper, given the Second Circuit's decision in *United States v. Harris*, 38 F.3d 95, 99 (2d Cir.1994) which specifically "rejected credit for any tax deductions that could be taken by the victims." *See also United States v. McAlpine*, 32 F.3d 484, 489 (10th Cir.) (holding that tax savings to victims cannot be set off), *cert. denied*, 513 U.S. 1031, 115 S.Ct. 610, 130 L.Ed.2d 520 (1994).

Although Rosetti testified that the wall plaques and the use by members of the Who's Who logo on business cards and stationary should be considered when offsetting the price of membership, he was unable to place an exact figure on these benefits. In addition, Rosetti did not include in his calculations continued benefits to the members from 1995 to the present. As such, if any of the former members are still using Who's Who membership on their resume or press releases and have obtained business as a result, that sum of money, as a benefit, was not calculated by Rosetti.

Rosetti concluded that members of Who's Who received approximately $650,000 in value from the savings associated with the various discounts offered by Who's Who and from receiving and benefitting from the Tribute Magazine. In addition, Rosetti concluded that members of Who's Who received benefits of approximately $20,400,000 as a result of networking. The networking benefits were derived by first estimating the number of new members each year. Then, Rosetti attempted to determine the percentage of

those who actually networked. This was accomplished by examining the reasons why people became members of Who's Who. In reviewing the Government's questionnaires, Rosetti determined that approximately 50 percent of the people stated that the primary reason they joined was for networking. Further, Rosetti concluded that $2,000 would be a reasonable sum of money as a benefit for people who had successfully networked. This figure was based upon discussions with various members of different organizations who were asked to value their membership in terms of the respective networking value. Rosetti concluded that $20,400,000 was received by 4% of the members of Who's Who during the period of 1990 through 1995. However, on cross-examination, Rosetti acknowledged that his estimate of those who benefitted "may have" to be revised had he known about the poor response to the business conferences proposed by Gordon in Vietnam, Hong Kong and South Carolina.

In addition to the testimony of Tenenbaum and Rosetti, the defendants attempted to demonstrate that some members of Who's Who were satisfied with their membership and did not believe that they had lost any money as a result of their membership. They did this by introducing into evidence five affidavits that were previously submitted to the Court in connection with the motion for return of the seized property. *See In re the Seizure of All Funds in Accounts in Names Registry Publishing, Inc.*, 887 F.Supp. 435 887 F.Supp. 435 (E.D.N.Y.1995) *vacated* 68 F.3d 577 (2d Cir.1995). Also, the defendants submitted the grand jury testimony of four of these individuals. Reviewing this subject matter, as an example, Twila Liggett stated in her affidavit that she considered *Tribute* magazine to be a "useful resource in my business providing a basis to find other professionals that I can call on to discuss topics of mutual business interest." Liggett also stated that she had "made several professional contacts through [her] membership and through a biographical article about [her] in the win-

ter 1994 *Tribute.*" However, Liggett also stated that she would "probably not" have purchased the membership had she known of the manner in which she was selected.

The defendants also introduced letters from Who's Who members attesting to their satisfaction with the products they received as a result of their membership. For example, Scott Sutker wrote in November 1995 "to let WWW [know] how impressed he was with the Who's Who listing on the CD–Rom." In addition, the defendants introduced evidence that many members of Who's Who either renewed or upgraded their membership, thus indicating a level of satisfaction with their status.

### 2. With Regard to the Tax Loss

In support of its contention that the tax loss attributable to Gordon and Reffsin is in excess of $1.5 million, Internal Revenue Agent Andrew Rosenblatt testified as to the capital gain distribution and constructive dividends from Who's Who; the amounts of money paid out of the account of Publishing Ventures, Inc. for purchase of the Manhasset condominium, for payments on the mortgage and for furnishing renovations at the condominium; and rent paid for the Manhattan penthouse. Based on these figures, Rosenblatt concluded that Gordon was responsible for an additional $2.2 million in federal taxable income. As a result of these computations, Rosenblatt testified that Gordon owed additional taxes in the sum of $818,000 for the period of 1990 through 1995. In addition, Rosenblatt concluded that between 1981 through 1986 and 1988 and 1990, Gordon owed approximately $840,000 in back taxes, excluding interest and penalties. Thus, according to Rosenblatt's calculations, the grand total of taxes owed by Gordon and also attributable to Reffsin was the sum of $1,662,832.

### III. DISCUSSION

#### A. The Court's Calculation of the Fraud Loss

Section 2F1.1 of the Guidelines states "increase the base offense level for a fraud

offense to account for the loss caused by the defendant. The increase is based on either the actual or intended loss, whichever is greater." However, Application Note 8(a) of Guideline § 2F1.1 acknowledges that "a fraud may involve the misrepresentation of the value of an item that does have some value (in contrast with an item that is worthless)." In fact, many courts have recognized the difference between a situation where a defendant defrauds a victim who receives no value as opposed to a situation where the defendant does defraud, but notwithstanding the fraud, the victim does receives something of value.

For example, in United States v. Maurello, 76 F.3d 1304 (3rd Cir.1996), a disbarred lawyer resumed practice by assuming the name of a retired lawyer in good standing, and then serviced hundreds of clients under that false name. The Government took the position that the loss should be the gross sum of the fees paid by the defrauded clients, as the clients did not get what they paid for, namely, the services of a licensed attorney. Not so said the Third Circuit, which disagreed with the Government's position and held that "[a] client who obtains a satisfactory contract, settlement, or verdict has received something of value, irrespective of whether the lawyer was licensed at the time." Id. at 1311. See also United States v. Barnes, 125 F.3d 1287, 1291 (9th Cir.1997) (holding that "[i]n light of the extensive precedent acknowledging that value may be rendered even amid fraudulent conduct, the district court erred in failing to award Appellant credit for the value of the services he provided satisfactorily."); United States v. Reddeck, 22 F.3d 1504, 1511 (10th Cir.1994) (adopting an "out of pocket" method for calculating net loss: the difference between the value paid by the victim and the value received.); United States v. Schneider, 930 F.2d 555, 558 (7th Cir.1991) (holding that "[i]t is necessary to distinguish between two types of fraud. One is where the offender—a true con artist ... does not intend to perform his undertaking, the contract or

whatever.... The other type of fraud is committed in order to obtain [the business] that the defendant might otherwise not obtain, but he means to perform [the business] ... and to pocket, as the profit from the fraud, only the difference between the contract price and his costs.").

◼ Based upon Application Note 8(a) and the cases cited above, in order to determine the true so-called "net" fraud loss, the Court is faced with the arduous task of calculating the difference between the gross membership fees paid by the members of Who's Who and the value of benefits, if any, that were actually received by the members. The Court notes that it is somewhat troubled by the foundation for the conclusions reached by the defendants' expert, Christopher Rosetti; namely, that $20,400,000 in benefits was accrued by members of Who's Who as a result of business networking and $650,000 was saved as a result of various discounts afforded to members of Who's Who. Rosetti's conclusions were not based upon interviews of former members of Who's Who, who may have been able to recall instances of networking and the use of membership products. In fact, the defendants did not produce any former Who's Who member as a witness at the Fatico hearing. In addition, some of the figures used by Rosetti were based upon discussions with members of other organizations, wholly unrelated to Who's Who. For example, when attempting to calculate the value of networking, Rosetti reached a figure of $2,000 per person after speaking with members of various Chambers of Commerce. In addition, it is important to note that Rosetti acknowledged that he "may have" adjusted his figures as to the number of people who participated in networking if he had known about the failed seminars in Vietnam, Hong Kong and South Carolina.

Further, Rosetti's networking conclusions did not take into account the absence of a published Who's Who Worldwide di-

rectory until 1991, and the fact that Who's Who was not even a "membership" organization until June 1991. Finally, Rosetti's networking conclusions did not consider Gordon's prior testimony at the civil proceeding, that until the end of 1993, more than 54% of Who's Who members did not even have directories with which to contact each other.

With regard to the value of the various discounts offered by Who's Who, after cross-examination by the prosecutor, Rosetti revised his calculations as follows: (1) Credit Cards—$240,000; (2) Airborne Express—$43,750; (3) Magazine / Business Advantage Program—$37,500; (4) Auto Insurance—$75,000; (5) Tribute Magazine—$30,750. The revised figure, therefore totals the sum of $427,000.

■ While the Court acknowledges the proven fact that the members of Who's Who did not get what they paid for, namely, membership in an exclusive registry nominated by their respective peers, it is undeniable that the members did receive other tangible and non-tangible benefits resulting from their membership. In making its factual determination as to the fraud loss, the Court considers all of these factors as well as the trial testimony and the testimony at the *Fatico* hearing. The Court also is reminded that Application Note 9 to § 2F1.1 states that "the loss need not be determined with precision ... [but] the Court need only make a reasonable estimate of the loss, given the available information."

In *United States v. Bryant,* 128 F.3d 74, 75–76 (2d Cir.1997), a tax case, the rule on uncertain fraud and tax loss amounts was clearly set forth:

> On appeal, Bryant contends that the attribution to him of $600,000 in losses with respect to unaudited returns was speculative and unfair.... In establishing sentencing tables that tie a defendant's offense level to the amount of loss caused by his offense, *see, e.g.,* Guidelines § 2T4.1 (loss caused by tax offenses); *id.* § 2B1.1.(b)(1) (loss caused

by theft offenses); *id.* § 2F1.1(b)(1) (loss caused by fraud offenses), the Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision. The § 2T1.1 commentary, which is applicable to a violation of § 7206(2), states that "the amount of the tax loss may be uncertain," and it envisions that "indirect methods of proof [may be] used...." Guidelines § 2T1.1 Application Note 1. **It states expressly that "the guidelines contemplate that the court will simply make a reasonable estimate based on the available facts."** *Id.*

> Similarly, the commentaries to § 2B1.1 and § 2F1.1 state that, for purposes of calculating the offense level for theft and fraud offenses, respectively, "the loss need not be determined with precision. **The court need only make a reasonable estimate of the loss, given the available information."** Guidelines § 2B1.1 Application Note 3; *id.* § 2F1.1 Application Note 8. A § 2F1.1 "estimate, for example, may be based upon the approximate number of victims and an estimate of the average loss to each victim...." *Id.* In keeping with this philosophy, it is permissible for the sentencing court, in calculating a defendant's offense level, to estimate the loss resulting from his offenses by extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown. Thus, in *United States v. Sutton,* 13 F.3d 595, 596–97 (2d Cir. 1994) (per curiam), where the defendant had received payments of $80– $1,500, usually in the $750-$1,200 range, for fraudulently issued driver's licenses, we found it not unreasonable for the sentencing court to compute the loss attributable to her scheme by estimating a payment of $250 per license and multiplying that sum by the total number of applications. *See id.* at 599–600.

*Id.* (emphasis added).

■ In this case, the Court finds that a reasonable estimate of *networking* afford-

ed to members of Who's Who, between 1990 and 1995, is the sum of $9,573,000—approximately one-half of the estimate stated by Rosetti. The Court agrees with the revised calculation regarding the Credit Card, Airborne Express, Business Advantage Program, Auto Insurance and Tribute Magazine benefits. The Court also notes that other tangible items including the plaque, the membership book and the value of the CD–ROM were not taken into consideration. Accordingly, the Court finds that the total loss figure of $20,000,-000 should be offset by $10,000,000 ($9,573,000 + $427,000) for purposes of calculating the loss pursuant to Guideline 2F1.1. As such, the fraud loss with regard to each defendant must be reduced by 50 percent.

### B. The Court's Calculation of The Tax Loss

As previously stated, the Government contends that the total federal tax loss attributable to both Gordon and Reffsin is the sum of $1,662,832. Section 2T1.1(c)(1) of the Guidelines states that "[i]f the offense involved tax evasion or a fraudulent or false return, statement, or other document, the tax loss is the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed)."

Gordon makes the following arguments with regard to the Government's tax loss calculations. First, he claims that the monies spent on the Manhasset condominium were not income to Gordon and did not result in a tax loss. Second, because Gordon was acquitted of the 1991 tax count, he submits that the 1991 loans should not be considered as income for tax purposes. Third, Gordon submits that the incremental amount of personal income tax attributable to the post–1991 loans should be offset by the corporate income tax that Who's Who would have saved had it deducted the loan amounts as salary. Fourth, with regard to the back taxes, Gordon contends that maximum tax loss attributable to him

is $252,000 due to an IRS agreement to an offer in compromise that would have reduced his tax liability. Fifth, Gordon charges that the Government failed to establish that the 1994 rental payments on the Manhattan penthouse constituted income to Gordon. As such, Gordon argues that the rental moneys should not be included in gross income or be applied to the tax loss. Finally, Gordon claims that it would be error to include any state tax loss due to the Government's failure to establish any state tax loss at the *Fatico* hearing. It should also be noted that while Reffsin joins in the arguments put forth by Gordon with regard to the computation of tax loss, Reffsin also claims that the tax loss should not be attributable to him under the rule in *United States v. Studley*, 47 F.3d 569 (2d Cir.1995).

### 1. The Manhasset Condominium

■ In its Rule 29 decision, the Court held that:

> The evidence disclosed that Who's Who Worldwide paid large sums of money to PVI, another company that Gordon controlled. PVI, however, was a "shell corporation," in that it had no employees and no real purpose other than to divert funds from Who's Who Worldwide to cover the condominium expenses. In 1993, these disbursements totaled more than $900,000, in 1994 more than $180,-000, and in 1995 more than $50,000. The expenditures were never disclosed to the IRS; the existence of PVI was not made known to the IRS; and the fact that Gordon had a controlling interest in the "company" was not made known to the IRS.

As a result of the Court's finding that Gordon was the "true owner" of the Manhasset condominium, it follows that he should be held responsible for the tax loss caused by his failure to report the sum for its purchase and upkeep as income. The Court acknowledges the case cited by the Government, *Visnapuu v. Commissioner of Internal Revenue*, 1987 WL 40403

(U.S.Tax Ct.1987), and notes its logical reasoning and applicability to this case. In a similar factual pattern, the United States Tax Court stated that:

> We have found that the Canadian lake house was Visnapuu's personal recreational facility. Although Visnapuu entertained some potential business associates at the lake house, such visits were primarily for pleasure and relaxation. Moreover, V & A reimbursed Visnapuu only for out-of-pocket entertainment expenses such as meals and liquor. Petitioners' contention that the Canadian lake house was a 'Conference Center' is totally without merit to the point of being frivolous. The lake house was for Visnapuu's personal enjoyment and, as V & A funds were diverted to him to pay for its operation and maintenance, such funds are income to Visnapuu under section 61.

*Id.* (footnote omitted). This Court has previously made a finding that the Manhasset condominium was Gordon's property, and thus, he must be held responsible to report as income the funds given to him for its purchase and maintenance.

### 2. The 1991 Tax Count

As a result of Gordon's acquittal of the charge of filing a false individual income tax return for the year 1991 (count 58), the Court declines to consider the additional tax due and owing for the year 1990 and 1991 for purposes of determining the tax loss. As such, the total federal tax due must be reduced by the sum of $20,106 and $45,473, respectively.

### 3. The Offset of Corporate Taxes

■ As previously stated, Gordon submits that if the loans are determined to be income to him, the taxable amount should be offset by deductions available for salary paid. Gordon cannot cite to any authority that requires such a conclusion. In opposition to this theory, the Government cites *United States v. Wu*, 81 F.3d 72, 75 (7th Cir.1996) which holds that:

the method [of calculating tax loss under the Guidelines] suggested by Wu would make it the responsibility of the United States Courts to comb the books of convicted tax evaders seeking ways in which they could have lowered their tax liability and their sentences. Unfortunately for Wu, it is simply not our role to play "Monday Morning Tax Advisor."

Gordon cites another Seventh Circuit case, *United States v. Valenti*, 121 F.3d 327 (7th Cir.1997), for the proposition that the Court permitted the defendant to go back in time and take deductions for sentencing purposes, even though he had originally failed to do so. In the absence of any authority in this Circuit or any clear consistency among the circuits, or even within a circuit, the Court will not permit Gordon to go back in time and re-classify the status of the monies that he received.

### 4. Back Taxes

■ As stated above, Gordon submits that the tax loss relating to back income taxes must be reduced because of the Government's offer of compromise. Due to the offer in compromise by the IRS, Gordon claims that the maximum tax loss attributable to him is the sum of $252,000. In *United States v. Clements*, 73 F.3d 1330, 1339 (5th Cir.1996), the Court held that "the 'tax loss' evaded means the tax deficiency assessed, exclusive of interest and penalties, rather than the amount that the IRS could actually recover." *Id.* (footnotes and citations omitted); *see also United States v. Brimberry*, 961 F.2d 1286, 1292 (7th Cir.1992) (in which the Court stated that "we have found no cases holding that 'tax loss' means the amount of money that the IRS could actually recover rather than the amount of tax owed.").

The Court agrees with the Government's position based on the well-reasoned decisions in *Clements* and *Brimberry*. In this regard, the Court is of the view that the Government established that the back taxes owed from 1981 through 1986 and 1988 through 1990 is the sum of $844,349.

### 5. The 1994 Rental Payments on the Manhattan Penthouse

Gordon asserts that the Government's inclusion in his 1994 unreported income of $72,963 paid by Sterling Who's Who as rent on the Manhattan penthouse is erroneous because he did not reside in the penthouse in 1994. The Court disagrees and finds that the evidence at trial and at the *Fatico* hearing established that the Manhattan penthouse was rented for the sole benefit of Gordon. As such, the sum of $72,963 paid by Sterling Who's Who as rent on the Manhattan penthouse is attributable to Gordon as income.

### 6. State Taxes

While the Government's original sentencing memorandum indicates that "[Gordon] should be held responsible for the tax loss caused to New York State as a result of his various tax fraud schemes," no calculation was provided. Moreover, at the lengthy *Fatico* hearing, the Government did not mention or introduce any evidence with regard to inclusion of state tax losses. After the conclusion of the *Fatico* hearings, in a letter dated August 19, 1999, the Government asserted that "$347,733.43 in state tax loss should be included as 'relevant conduct' in the tax loss computations for Sentencing Guideline purposes at the sentencing of Gordon and Reffsin." Due to the Government's unjustifiable delay in presenting this evidence, as well as the absence of any testimony or evidence at the trial or at the *Fatico* hearing regarding Gordon's state tax liability, his state returns, his state payments or any other dealings that Gordon or Reffsin may have had with state officials, the Court declines to include the alleged state tax loss as relevant conduct for the purpose of computing the total tax loss.

### 7. Reffsin

■ After trial, Reffsin was found guilty of conspiring to impair, impede and defeat the IRS; evading the payment of taxes for the years 1981–1990; and assisting in the filing of false tax returns for the years 1992 to 1994. The Court finds that, with regard to the amount of tax loss, the rules in the Second Circuit's decision in *United States v. Studley,* 47 F.3d 569 (2d Cir.1995) have been satisfied. The testimony at the trial established that the acts for which Gordon is being held accountable were readily foreseeable by Reffsin and were within the scope of his agreement with Gordon. As such, the Court declines to separate the tax loss attributable to Gordon from Reffsin.

### III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED,** that the total fraud loss of $20 million must be off-set by $10 million, thus resulting in a 50 percent reduction as to the calculations contained in the present pre-sentence report with regard to each defendant; and it is further

**ORDERED,** that the tax loss as calculated by IRS Agent Andrew Rosenblatt must be reduced by the sum of $65,579; and it is further

**ORDERED,** the Probation Department is directed to incorporate these changes in an addendum to the pre-sentence report, to be served at least thirty (30) days prior to the date of sentence; and it is further

**ORDERED,** that any other request by the defendants, with regard to either a reduction in the calculation of the fraud loss or the tax loss is **DENIED;** and it is further

**ORDERED,** that the Government's request to include state tax loss computations as relevant conduct for purposes of sentencing Gordon and Reffsin is **DENIED;** and it is further

**ORDERED,** that the specific objections and requests for downward departures as to each defendant will be determined by the Court at the time of sentence; and it is further

**ORDERED,** that the Clerk of the Court is directed to mail a copy of this Order to all parties; and it is further

**ORDERED,** that the defendants are to appear for sentencing on the following dates and time:

| | |
|---|---|
| Bruce Gordon | January 7, 2000 at 1:30 PM |
| Who's Who Worldwide | January 14, 2000 at 1:30 PM |
| Sterling Who's Who | January 14, 2000 at 1:30 PM |
| Tara Garboski | January 21, 2000 at 1:30 PM |
| Oral Frank Osman | January 28, 2000 at 1:30 PM |
| Laura Weitz | February 4, 2000 at 1:30 PM |
| Annette Haley | February 11, 2000 at 1:30 PM |
| Scott Michaelson | February 18, 2000 at 1:30 PM |
| Steve Rubin | February 25, 2000 at 1:30 PM |
| Martin Reffsin | March 3, 2000 at 1:30 PM |

No adjournment of these dates and times will be granted absent extraordinary circumstances.

**SO ORDERED.**